### SEABOARD AIR LINE RY. et al. v. UNITED STATES.[1]

(District Court, E. D. South Carolina, at Charleston. May 5, 1921.)

1. **Eminent domain ⊂⟩136—Anticipated use of property held too speculative for consideration.**

In determining what is just compensation to be paid for a part of a tract of land, held by a railroad company for yard purposes, requisitioned by the government for war uses, the effect of such taking on the value of the remainder of the tract for the intended use is to be taken into account; but where no use had been made of the land by the company, and its use and value for yard purposes is dependent on the future development of sufficient industries or business at the point to require it, which is uncertain, its anticipated value for such use, should such things come to pass, is too speculative to be taken as an element of damages. Nor can any added value given to the tract by improvements made or business created by the government on nearby property be taken into consideration.

2. **Eminent domain ⊂⟩202(1)—Evidence admissible on question of damages for taking.**

Where a part of a tract of land held by a railroad company for yard purposes, but not yet utilized, was taken by the government for war use,

---

[1] This charge is printed at the request of the Department of Justice, the request being based upon the number of cases pending in the federal courts involving similar issues, and the consequent immediate importance and wide interest which attaches to a full expression on the subject of "just compensation."

which, as claimed by the company, destroyed the value of the remainder for yard purposes, evidence that other ground equally available for such purposes could be procured at reasonable cost *held* admissible on the question of damages.

At Law. Action by Seaboard Air Line Railway and others against the United States. Charge to the jury.

Petitioners' requests to charge were read by the court. Petitioners except to refusal to charge in manner and form as asked. Defendant's requests to charge were read by the court. Defendant excepts to refusal to charge in manner and form as asked. Petitioners except to allowance of defendant's requests to charge, as allowed. Defendant excepts to allowance of petitioners' requests to charge, as allowed.

Buist & Buist, of Charleston, S. C., for petitioners.
Francis H. Weston, U. S. Dist. Atty., of Columbia, S. C.

SMITH, District Judge. Mr. Foreman and Gentlemen of the Jury:

The question before you is on what we call an issue to determine the amount of compensation to be paid. The proceedings are to determine what should be paid to the Seaboard Air Line Railway Company, a corporation, by the United States, for the piece of land, 2.6 acres, which the public found itself compelled to take possession of and utilize during the late war, for public ends in a public exigency.

In this country, which is a free country, it is recognized that what is called the common weal, the benefit of the public as a whole, is superior to that of the individual, and that, where the preservation of the country or the commonwealth as a whole is necessary, it has the power, to effect that preservation, to take the private property of individuals, which is necessary in an exigency to effect it. It is another application of that maxim of democratic government which is called the principle of the greatest good for the greatest number.

In so doing, when I say that "the government" has that power, I do not mean the government as a distinct entity from the people, because in a free country, such as the United States is, the government is nothing but the people themselves, and it means that if the acting administration for the benefit of the people at large—you, and myself, and the people at large—in the protection of the commonwealth, or the effecting of any salutary measure for its benefit, finds it necessary, it has the power to use property, which may be that of an individual, for those public purposes.

But, as it is a free country, a country of the people, it is recognized in our constitutional basis of government that to take property of an individual is in some sense taxation for the benefit of the whole community, and it is neither just nor proper that the entire weight of that special form of taxation should be borne by an individual, and therefore it is that the constitutional provision is that, where the government finds it necessary for the public benefit, the public safety, public health, public protection, to take the property of an individual, it must pay to that individual a just compensation. That just compensation, of course, is paid by the country at large, and to the extent that the in-

dividual himself, the taxpayer, contributes to the general burden, he contributes, because the action is for the benefit of the country at large, and therefore the country at large—all of us—join in the contribution of the compensation for the payment, just as we join in the payment of a tax for the support and administration of the government generally. That applies, whether or not the property is the property (as in this case) of a corporation, a railroad corporation (which is a quasi public corporation), or of a private corporation, or of a private individual.

Now, this piece of property was taken by the government under the exigency of a war measure, which is the most severe and requires immediate action, more so than any other exigency known to humanity. It was taken by the country for that purpose, but taken subject to obligation of the country as a whole to pay just compensation to the railroad corporation from which they took it.

It appears from the testimony that some years ago (according to Mr. Rhett's testimony) a number of people interested engaged in the promotion, so to say, of the establishment of a port or landing place or shipping point, and the development of a large body of land which they afterwards called North Charleston. I think he said they bought 4,500 acres, at any rate, a large amount, for $150,000.

Now, as part of that development, to give value to the enterprise, which, of course, was an enterprise for the purpose of making money for individuals—it was not a humanitarian or philanthropic enterprise, but they bought this for the purpose of an enterprise—very laudable enterprise, because it is by the development of enterprises such as this that the prosperity of the country is carried on; and in order to assist in the development of that enterprise, to give value to their property which they had purchased, a return for profit in their undertaking, one of the first steps they took was to attract the railroads to come to Charleston, to come to that point—have proper terminals at that point.

So they made advances, he said, to the Southern Railway, the Coast Line Railroad, and to the Seaboard, which at that time was tending towards Charleston. He testified, as to the Coast Line and the Southern Railway, he offered them each a right of way as far as their lines extended; if they would build from their tracks to this point, he would give them yards; and he made the same offer to the Coast Line, if they would build that long line of track through there, and they did give them a right of way, and gave them a yard. Of course, when he said "give," it was given for an ulterior purpose. He wanted to have the railroads there, to give a value to the development of this enterprise, and so it was a donation, to result (as he and they hoped) in great value to a very large part.

At any rate, they gave them this right of way, and they set out these different yards. It was a portion of the yard so given for this purpose to the Seaboard Air Line Railway that was the portion taken by the government under this exigency, and that these proceedings have been brought to adjust and settle the proper valuation for, the proper compensation to be paid—the just compensation.

Now, it appears from the testimony that the Coast Line built a spur to North Charleston, and so did the Southern Railway. In the case of the Seaboard Air Line Railway, as he mentioned, and as can be shown, it was not necessary for them to go to the additional expense of building a spur, because their main line ran right straight through North Charleston, as it was; so they, in that case, received only their yard. None of these yards, it appears, were ever developed or improved, or anything done to them, to make them railway yards, by the railroads.

That, however, would not affect this question at all, and even then the evidence shows that the United States government, not very long after the acquisition of this yard by the Seaboard Air Line Railway, took possession of the railroads, and retained possession of the railroad property until January, 1920. So that the railroads could not possibly have developed the yards whilst in the possession of the government, and there is no imputation against them they did not develop them from any lack of value, no adverse imputation on that point, because they were not in a position, if they had desired; but the fact is that the Seaboard Air Line Railway's yard, so far as the Seaboard Air Line Railway was concerned, was never developed. The land is in the same condition; waste, I think they called it, or pine barren, or open land, or wooded land. It remained in this condition, so far as any action of the Seaboard Air Line Railway was concerned. It was intended for a yard, a railroad yard.

Then the war came on, during which the government seized and operated the railroads, and in the summer, in June, 1918, while the war was at its height, the representatives of the public found it necessary, in order to lay the proper tracks, to leave a large area that the government had also requisitioned for the purposes of war, that they should cross with their tracks a small portion of this yard, which they afterwards developed to take in the 2.6 acres.

The government had requisitioned, as you see, a large area of completely undeveloped land above, which they called Filbin, or which belonged to the Filbin Corporation, right there adjacent to Cooper river, and running back, according to the testimony, entirely undeveloped, a large area next to the river; but the government had requisitioned that for the purpose of a munitions supply base and removal port for the soldiers to be sent to France, and for the supplies to be forwarded after them, absolutely necessary for the maintenance of the war and the protection of the country; and in order to get the necessary trackage to carry the material for the utilization of that territory, so requisitioned, and prepare the wharves and the warehouses and the storehouses, and everything that was necessary for the purposes of war, in June, 1918, they found it necessary to cross with their tracks this point of this yard of the Seaboard Air Line Railway.

It appears that the point at which they crossed was (half of it, at least) low ground, marsh, which had never been, as I said before, developed by the railroad, and that the government then filled it up, and laid the necessary trackage across it, and then proceeded to develop the government requisition, and build its storehouses, and fill up the

marshes, and build wharves, and lay tracks, and do whatever was necessary in the matter.

Having seized this 2.6 acres, about nearly a year afterwards, in May, 1919, they having already taken possession under the exigencies of war, they then gave formal notice, 11 months afterwards, that the government would condemn it. They requisitioned it—that is, they condemned it—as essential to their purposes, and they did condemn it, took the 2.6 acres, under those circumstances, from this yard; and the only question before you now is:

"What is a fair and just compensation that they should pay to the railroad company for taking it?"

That they are bound to do. They have taken some of its property, and in any event they are bound to pay something, and it is for the jury to say how much they should pay. That depends on how much is just compensation, fair value, for what they did take, under all the circumstances. Whether it was undeveloped or not, it does not affect the railroad company's right to receive what was a fair compensation, a fair value. If you have a piece of land, which you have not seen fit to develop, and which is taken possession of for public purposes, you are still entitled—although you may not have used it yourself, you are still entitled—to fair compensation. The fact of your using it, or not using it, has nothing to do with it, except so far as using it may show what its value was.

So, in this case, the railroad company is entitled to something in any event, because unquestionably the government has taken the 2.6 acres of its land. The question is: How much? And I charge you as a matter of law that, when a man's property is taken compulsorily, against his will, except in so far as every citizen is supposed to join in the wish that proper measures should be taken for the common weal, or protection of his country; otherwise when he is required to yield it for the public good, he is entitled to full compensation—full compensation, whatever the jury under all the circumstances, finds as full compensation.

[1] Now, in this case, the railroad's position is that this yard was peculiarly adapted for their purposes, present and future, and that the taking of this area of 2.6 acres is equivalent to the destruction of the whole, so far as the value is concerned; that you might just as well take the whole 7½ acres, because the taking of the 2.6 acres is destructive of the purposes for which the railroad owned it—that is, for the purposes of a railroad yard; and if the jury find this to be correct, that the taking of this 2.6 acres is destructive of the uses for which they intended it of the remainder, and leaves the remainder as having no value to them, why then they are entitled to it. Of course, whatever little value applies to the rest of it must be deducted, because that is left to them; but if that remaining value is immaterial, as they claim it is, would mean that they practically would be paid for the whole.

There is an element which comes into the ascertainment of what is the just compensation. You have heard—gentlemen, I charge you, on that, that the railroad company, like an individual, is entitled to what-

ever the property is fairly worth at the time of the taking for the purposes for which it was intended, and which in your opinion it reasonably could within a reasonable period have received on application of the property to such purposes.

Now, to say that they bought it as a railroad yard, when the facts are that it would not be worth while to utilize it for a long distance into the future, is not to mean that it has the value of a present yard in use, because it may be that this enterprise would never have developed. When carried to an extreme, it becomes speculative—so speculative and uncertain that you could not take that as an element of value. If this enterprise failed, there was no further development, no further business there, the further use of this property as a yard would be unnecessary, and therefore the development of the property would not be an element of damage. The claim that they must be paid upon the hypothesis—that you had a well-settled place, teeming with a large population, and functioning with the activity and demand of a number of enterprises—if that is not established as existing at the time, or within a reasonable time, a reasonable period, within reasonable foresight, it does not become an element of value. And the next thing is that whatever additional value might have been given to it by the requisition of the government of the adjacent territory, and its development, is not to be considered by you, in giving the value to this yard.

The government for the public good condemned this large amount of property, and at an immense expense for public purposes has developed it. Well, that was due to the extraordinary circumstances of the existence of a great war, and does not enter into the computation; because fortuitously that happened and may give value to this railroad yard, it is not an element to enter into the computation; because that is an increase in value, not part of a business anticipation, but fortuitously from the general action of the government for the general good. This development is for the general good, and as a part of that general development this piece of property was taken at the same time.

As, for instance, if the government had requisitioned this adjoining property, and developed it to such an extent that there were 10,000 people upon it, say, and by chance they overlooked a small tract owned by an individual, which was necessary for access to it, it would not be possible for that individual to say:

"Yes; I had an old piece of barren, useless property; but now you have created a teeming city of 10,000 people, and I stand up and refuse to sell, refuse to allow you to have it, except at what the jury may find to be a most exorbitant price."

That would not be permissible. It would not be correct to apply to it the term "blackmail"; but it would be a person making a tortious and improper use of a position that he had not created. That is frequently seen in what is called the "unearned increment"; the increase in the value of property, from the growth of population. Natural growth of that kind, such as the business development around this yard, is a natural and proper element to be considered by the jury in estimating the loss to a man losing his property. That is the unearned increment to

which he is entitled, but not when that unearned value arises from the act of the government for the common good, for the purposes of an exigency, and condemnation and taking of this piece of property was simply as part and parcel of that act of the government for the common good.

So I charge you that that existence of this developed property, which the government has developed at such an enormous expense (I think the testimony was some $16,000,000) —its existence, with the concomitant value that it would naturally add to adjacent territory, does not constitute an element which you are to consider in estimating the value of this railroad yard.

Now, gentlemen, you are to consider the testimony. Every business man has a right to a reasonable foresight, anticipation of business, a reasonable mercantile anticipation of what is to come. If you buy a piece of land, you are entitled to a reasonable foresight as to what will be the utilization of gradual rise and development of land in the vicinity, and to that sort of increment you are entitled. You are entitled to take the donation (if you call it such) of this railroad yard, and are entitled to whatever value it possessed as a yard, and also what value might come from a reasonable anticipation of the development within a reasonable time; not an uncertain, vague, and speculative period, but a reasonable time.

When I say "donation"—Mr. Rhett testified that he considered his enterprise very much helped by the act of the railroads in coming there, but that would not mean the value proceeding from the railroads. The only value proceeding from this road; he testified that there was a terminal delivery railroad company, a small terminal delivery railroad company, to receive freight from these three railroads, and which had been built one-third by each; and that has been the only testimony produced of any actual payment by the Seaboard Air Line for the taking of this property; but I charge you that is not necessary.

Even if it was an absolute donation, they are entitled to its full value. If a parent devises to me a house, or a man gives me a house, you are not to say, if its condemnation is necessary, that I am not to be paid anything, because it cost me nothing. I am the owner of it, and I am to be paid whatever is the just compensation for the taking, irrespective of what it did or did not cost me. Now, the question is: What is the just compensation for these 2.6 acres of land?

On that I charge you: You are to consider its availability for a railroad yard, but not in the sense that, because you cannot get another railroad yard, you are to pay whatever is demanded. That would be absurd. That would be akin to the illustration you have heard: If a man's leg was taken off, you are to pay him any amount he chooses to demand for his leg, because it cannot be supplied again. So, even if this was the only place for a yard, the railroad company cannot say:

"Unless you can give me another yard, I demand a million dollars."

The full absurdity of such a statement is evident. It is not that anything is to be paid because it cannot be replaced; but the question for

the jury is to say: What is that yard fairly and reasonably worth to the owner, if it had used it?

One of the elements is what it would cost, of course, to get another yard. If you could not get another yard, however, the question is:

"What is it worth to you, its use, what was it worth to you, even if you could not get another yard? Suppose you did lose it—suppose you had 7 acres there and could not get another yard; what does it amount to, to you?"

That is one question.

Another element is:

"Well, what would it cost you to get another yard, the reasonable equivalent of this, for use?"

That is another element, not a hypothetical valuation at all. You see this was a perfectly undeveloped piece of land; but simply what it would cost you to get, within a reasonable time, not at any limited point —if you can get a yard within two miles or three miles. Railroad yards depend upon their propinquity and also upon their accessibility and availability. As to the freight going north, it may be that a yard further removed would save that much hauling. As to a yard nearer Charleston, that would mean that much further hauling. So it need not mean an adjacent yard; but whatever the jury finds to be a reasonable equivalent, at a reasonable distance. And that, gentlemen, I think is pretty much the expression of law. In all these cases, where compensation is asked, it is rather difficult to fix it.

You have heard on that point the evidence of a witness named Strom, who says the railroad can still use this yard. If it used it in its present condition, according to his testimony, it would have two or three tracks which are quite as long as any they would have, and those tracks would be equivalent storage for what could be reasonably expected of business to be developed.

On their outer tracks they would be restricted, I think the testimony of Col. Lamphere was, if they used the diminished 5 acres, instead of 7½ acres, they would lose a storage (I think he said) of 59 cars, or 69— I don't remember. They would lose that storage. The testimony of Mr. Strom, that you have heard, was that, as to one or two tracks, they would have an equal length of storage, very nearly, as if they had kept the whole of the original 7 acres; but as to the five others—other tracks —they would have diminished lengths, which would necessarily diminish the storage.

Now, if it was utilizable—if in the opinion of the jury the diminished remainder was utilizable—for all reasonable expectations, then it is for you to say to what actual amount the real value of the yard was diminished, by the taking away of the 2.6 acres. You have heard the testimony on behalf of the Seaboard Air Line; that the taking of these 2.6 acres would practically destroy the value. That is a matter for the jury. That is your jurisdiction, because this is a question of fact; that is a question for you, whether it does or not.

If what is left could be reasonably used for a yard, to fulfill all immediate or reasonable anticipation of business to be performed within a reasonably future period, it is for the jury to say, if at all, to what

extent the value of the yard was really diminished by the taking away of the 2.6 acres of low land taken and filled up by the government. So it is just for you to say. You have heard the testimony. If they were given 2.6 acres on the other side of Cosgrove avenue, to what extent that would remedy the loss which they suffered. Whether it be correct that Cosgrove avenue is an avenue for business purposes and other purposes, right across, would not mean that the extended portion was practically useless. That is the position of the Seaboard Air Line Railway.

There is one point in there, that the mere existence of Cosgrove avenue does not mean, if they had this yard, they would necessarily be free of all crossing at Cosgrove avenue, because the main line now crosses Cosgrove avenue, and if the throat of the yard, as it originally existed, ended at Cosgrove avenue, as is the case, then all north-bound freight would have to be hauled over the main line, or any other track over Cosgrove avenue; although it is certainly unquestioned, if they attempted to carry 13 tracks, the full complement of the yard, according to the design of Mr. Strom, you would have that many more tracks crossing a public thoroughfare. So you are to consider whether the availability of the two yards immediately—one on the west side, and one on the other side, how they affect it. You have heard the testimony as to that.

[2] I charge you that the Seaboard Air Line is not bound to procure any other yard. It can remain quiet and say:

"You have spoiled my yard. I won't procure any other yard. You must pay me my damages."

And they can put their yard 5 miles off, if they see fit. They are not bound to procure any yard. The admissibility of that testimony is only on the point of showing that equally good yards could be procured without the excessive price demanded by the Seaboard Air Line Railway; and that, gentlemen, is about all the explanation I think it is necessary to make.

You must find something for the Seaboard Air Line Railway, if it is only one cent. They are entitled to something. I say one cent—of course, that is absurd; but I mean they are entitled to something, because their land has been taken; but in that case, if you find that the diminished land still afforded them a yard, still large enough for their reasonable necessities, within a reasonable time, of reasonable foresight, then you must estimate it, not upon the necessity of a yard, but upon what you think a piece of low marsh land of that character in that locality is worth.

What you will do is to give them just compensation for the loss—just to both sides. In these cases, the government does not stand in the position of a private enterprise, which is sometimes empowered to condemn for the purposes of private development. The government is supposed to be condemning for public exigency, and to subserve no private purposes. But none the less they are to pay just compensation to the person whose property is taken; which just compensation is to be borne by the whole country at large.